## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

Steven Pelletier, Individually and On Behalf of )
All Others Similarly Situated, )
                                           )      Civil Action No. _____
           Plaintiff, )      ECF Case
                                           )
          vs. )      **CLASS ACTION COMPLAINT**
                                           )      **FOR VIOLATIONS OF THE**
MARSH & MCLENNAN COMPANIES, INC., )      **EMPLOYMENT RETIREMENT**
NORMAN BARHAM, LEWIS W. BERNARD, )      **INCOME SECURITY ACT**
FRANK J. BORELLI, MATHIS )
CABIALLAVETTA, PETER COSTER, )
CHARLES A. DAVIS, ROBERT F. ERBURU, )
OSCAR FANJUL, RAY J. GROVES, )
JEFFREY W. GREENBERG, STEPHEN R. )
HARDIS, GWENDOLYN S. KING, LORD )
LANG OF MONKTON, DL, DAVID A. )
OLSEN, MORTON O. SCHAPIRO, ADELE )
SIMMONS, JOHN T. SINNOTT, A.J.C. )
SMITH, FRANK J. TASCO, MARSH & )
MCLENNAN COMPANIES, INC. BENEFITS )
ADMINISTRATION COMMITTEE, MARSH )
& MCLENNAN COMPANIES, INC. STOCK )
INVESTMENT PLAN COMMITTEE, )
SANDRA S. WIJNBERG, SANDRA )
WRIGHT, WILLIAM L. ROSOFF, STATE )
STREET CORPORATION, DEUTSCHE )
BANK, AND JOHN DOES 1-50, )
                                           )
          Defendants. )

—————————————————————— x

**05 CV 2830**

RECEIVED
MAR 1 4 2005
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff is a participant in one or more of the employee retirement plans offered by

Marsh & McLennan Companies, Inc. ("Marsh" or the "Company"), including: Marsh &

McLennan Companies, Inc. Stock Investment Plan ("SIP" or "401(k)"), Marsh & McLennan

Companies, Inc. Stock Investment Supplemental Plan ("SISP"), and Marsh & McLennan

Companies, Inc. Global Stock Purchase Plan ("Stock Purchase Plan"), and Marsh & McLennan

Companies, Inc. U.S. Retirement Program, including the Retirement Plan, Benefit Equalization

Plan, and Supplemental Retirement Plan ("Retirement Plan"), all of which are collectively referred to herein as the "Plans". Plaintiff brings this action on behalf of a class of similarly situated participants in or beneficiaries of the Plans (the "Participants"), by plaintiff's attorneys, after review of public documents, news media reports, Securities and Exchange Commission ("SEC") filings, and a complaint filed by the Attorney General for the State of New York on October 14, 2004 in the Supreme Court of the State of New York, County of New York (the "Spitzer Complaint")[1], and alleges the following:

**NATURE OF THE CASE**

<u>The Plans</u>

1.      The Plans are "employee pension benefit plans" as defined by § 3(2)(A) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(2)(A). The relief requested in this action is for the benefit of the Plans and their Participants.

2.      Plaintiff alleges that defendants, fiduciaries of the Plans, breached their duties to Plaintiff and to the other Participants in the Plans, in violation of ERISA, particularly with regard to the Plans' holdings of Marsh stock.

3.      Each of the Plans maintained significant holdings in Marsh stock and/or required Participants' investments to be held, in whole or in part, in Marsh stock. For example, in the Company's SIP, Participants' investments were overwhelmingly limited to Company stock, all matching funds were in Company stock, and Participants were not permitted to meaningfully diversify their investments. Where Participants were permitted to diversify, they were substantially limited to investments in funds managed by Putnam Investments, a wholly-owned subsidiary of

---

[1] All quoted text unless stated otherwise has as its origin in the allegations of the Spitzer Complaint.

Marsh, which has recently undergone scrutiny for permitting "market timing" to benefit at the detriment of other fund investors.

4.      At the end of year 2003, almost 60% of the SIP's assets were in Marsh stock, or approximately $1.3 billion of the SIP's $2.24 billion in assets and most of the remainder of the SIP's assets were in Putnam funds.  In the Stock Purchase Plan, approximately 5 million Company shares were bought by Marsh employees in 2003, or almost 1 percent of the approximately 533 million shares outstanding at the Company at the end of 2003.

The Company's Business Practices

5.      Marsh is the largest provider of insurance brokerage and consulting services in the world.  In that regard, Marsh's business as an insurance broker is comprised of the following services: (1) evaluate the policyholders' insurance needs; (2) recommend insurance products and insurance companies to policyholders; (3) negotiate customers' coverage and premiums with insurance companies; (4) evaluate and present claims to insurance companies; and (5) negotiate settlements of claims on behalf of customers (collectively "insurance brokerage services").

6.      As payment for its insurance brokerage services, policyholders typically agree that Marsh will receive a specified percentage of all insurance premiums paid.  In other instances, Marsh is paid a fixed fee or commission for their services by customers.

7.      Marsh has also been paid fees by insurance companies, based upon the amount of business Marsh steered to each company.  Marsh's agreements with insurance companies that provide for these contingent or backend commissions are referred as "contingent commission contracts", "market services agreements", or "placement service agreements" (collectively hereinafter referred to as "Placement Service Agreements").

8.      These arrangements, in essence, were designed to allow Marsh to control its flow of business to the carriers that have agreed to pay it the largest kickbacks and thereby increase its profits even further.   Under the Placement Service Agreements, Marsh was also given incentive to keep the amount of claims by its customers to the insurance companies as low as possible since this metric was also used in connection with certain carriers to determine the amount of the contingent commission Marsh was paid.  In 2003 alone, it has been reported that Marsh received approximately $845 million pursuant to these contingent commission arrangements.

9.      In addition to entering into Placement Service Agreements and receiving commissions for steering business to certain insurance companies, the Company was engaged in the practice of "bid rigging."

10.      In order to make customers believe that Marsh had received "bids" from various insurance companies in attempt to get the lowest possible price and most favorable terms for the customer, Marsh "rigged" bids by asking certain insurance companies to bid higher than the company to which Marsh had already determined to steer the customer's business.  This practice is more fully described below.[2]

11.      Marsh's "bid rigging" schemes were not only in direct conflict of interest with Marsh's customers, but were fraudulent and illegal, and have opened the Company up to massive civil and criminal liability, lost future revenues, tarnished reputation, potential inability to borrow, and potential loss of customers.

12.      For these reasons, defendants knew or should have known that Marsh stock was an imprudent investment alternative for the Plans due to the improper business

---

[2]      The allegations herein concerning Marsh's practice of bid rigging are derived from the Spitzer Complaint.

practices at the Company and the overwhelming risk that the Plans assumed by holding Company stock in such large, concentrated amounts.  Defendants are liable under ERISA to restore losses sustained by the Plans and Participants as a result of defendants' breaching their fiduciary obligations to (i) monitor the Company's administrators and to provide them with accurate information; (ii) provide complete and accurate information to the Participants; (iii) avoid conflicts of interest; and (iv) diversify Participants' investments.

13.     In one week's time after the scandal now engulfing the Company became public (upon the filing of the Spitzer Complaint on October 14, 2004), the Company's stock lost almost 50% of its value, falling from $46.13 on October 13, 2004, to approximately $24.85 on October 21, 2004.  The stock is currently priced at $32.02, still well below its value at the time of the filing of the Spitzer lawsuit.  In other words, as a result of defendants' fraudulent and improper conduct, current and former employees of Marsh have lost as much as half of their retirement savings, devastating lives and putting into peril the very economic futures the defendants were duty-bound to protect.

14.     On or about October 19, 2004, the Company announced SIP participants would be able to diversify their investments starting October 25, 2004, thereby changing gears from its previous policy of requiring significant Participant investments in Marsh stock.

## THE PARTIES

Plaintiff

15.     Plaintiff was a Marsh employee, is a Participant in the Plans pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7) as of October 14, 2004, and continues to hold Company stock in his retirement investment portfolio.

Defendants

16.     Defendant Marsh is a professional insurance services firm that is headquartered at 1166 Avenue of the Americas, New York, New York, 10036.  It is the world's leading risk and insurance services firm, as well as the world's largest provider of insurance brokerage and consulting services.  Marsh has 410 owned-and-operated offices and 42,000 employees, in more than 100 countries.

17.     Marsh is the Plans' sponsor and is a fiduciary of the Plans within the meaning of ERISA.  Marsh exercises discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.  Marsh at all times acted through its officers and employees, including its Chief Executive Officer ("CEO"), and members of its Board's oversight or the Plans' administrative committees, appointed by the Company to perform fiduciary functions in the course and scope of their employment.

18.     Marsh had, at all applicable times, effective control over the activities of its officers and employees, including over their activities concerning the Plans.  Marsh, through its Board of Directors ("Board"), executive officers or otherwise, had the authority and discretion to hire and terminate said officers and employees.  Marsh, through its Board and otherwise, also had the authority and discretion to appoint, monitor, and remove directors, officers and other employees from their individual fiduciary roles with respect to the Plans.  By failing to properly discharge their fiduciary duties under ERISA, the defendants breached their fiduciary duties owed to the Plans' Participants.  Accordingly, the actions of these fiduciaries are imputed to Marsh under the doctrine of respondeat superior, and Marsh McLennan is liable for such actions.

Director Defendants

19.     Defendant Norman Barham ("Barham") served on Marsh's Board during the relevant periods.  Barham was a fiduciary of the Plans within the meaning of ERISA in that

he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

20.     Lewis W. Bernard ("Bernard") has been a director of the Company since 1992.  Bernard was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

21.     Defendant Frank J. Borelli ("Borelli") served on the Board during the relevant periods.  Borelli was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

22.     Mathis Cabiallavetta ("Cabiallavetta") has been a director of the Company since 2000.  Defendant Cabiallavetta was also the Company's Vice Chairman.  Cabiallavetta was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

23.     Peter Coster ("Coster") has been a director of the Company since 1988. Coster was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

24.     Charles A. Davis ("Davis") has been a director of the Company since 2000.  Defendant Davis is also the Company's Vice Chairman since 1999.  Davis was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with

respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

25.     Robert F. Erburu ("Erburu") has been a director of the Company since 1996.  Erburu was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

26.     Oscar Fanjul ("Fanjul") has been a director of the Company since 2001.  Fanjul was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

27.     Ray J. Groves ("Groves") has been a director of the Company since 1994.  Groves was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

28.     Jeffrey W. Greenberg ("Greenberg") has been a director of the Company since 1996.  Defendant Greenberg is also the Company's Chairman and Chief Executive Officer.  Greenberg was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

29.     Stephen R. Hardis ("Hardis") has been a director of the Company since 1998.  Hardis was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

30.     Gwendolyn S. King ("King") has been a director of the Company since 1998.  King was a fiduciary of the Plans within the meaning of ERISA in that King exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

31.     Lord Lang of Monkton, DL ("Monkton") has been a director of the Company since 1997.  Monkton was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

32.     David A. Olsen ("Olsen") has been a director of the Company since 1997.  Defendant Olsen was also the Company's Vice Chairman from May through December of 1997.  Olsen was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

33.     Morton O. Schapiro ("Schapiro") has been a director of the Company since 2002.  Schapiro was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

34.     Adele Simmons ("Simmons") has been a director of the Company since 1978.  Simmons was a fiduciary of the Plans within the meaning of ERISA in that Simmons exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

35.     Defendant John T. Sinnott ("Sinnott") served on the Board during the relevant periods.  Sinnott was a fiduciary of the Plans within the meaning of ERISA in that he

exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

36.    A.J.C. Smith ("Smith") has been a director of the Company since 1977. Defendant Smith was also the Chairman of the Company from 1992 to 2000 and was its Chief Executive Officer from 1992 to 1999.  Smith was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

37.    Defendant Frank J. Tasco ("Tasco") served on the Board during the relevant periods.  Tasco was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

Committee Defendants

38.    Defendant Marsh & McLennan Companies, Inc. Benefits Administration Committee ("Administration Committee") is the SIP Administrator and has discretionary authority to control and manage the operation and administration of the Plans.

39.    The Administration Committee is a fiduciary of the Plans in that it exercises discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

40.    While the individual members of the Administration Committee are currently unknown to Plaintiff, once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

41.    Defendant Marsh & McLennan Companies, Inc. Stock Investment Plan Committee ("Plan Committee") is a fiduciary of the SIP.

42.     Defendant Plan Committee consists of persons appointed by the Chief Executive Officer ("CEO") or Board of Directors ("Board") of Marsh & McLennan, and such members may be removed at any time, with or without cause, by the CEO and/or the Board.

43.     Marsh has delegated to Defendant Plan Committee the power and authority to administer the Plans in conjunction with the Plans Administrator (i.e., the Administration Committee).

44.     The Plans Committee was a fiduciary of the Plans within the meaning of ERISA in that it, through the actions of its appointed members, exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

45.     Defendant Sandra S. Wijnberg ("Wijnberg") is the Company's Chief Financial Officer and Senior Vice President.  In addition, she served as a Trustee of the SIP and Chairperson of the SIP Committee during the relevant period.  Wijnberg signed the Company's 2001 Form S-8 on behalf of the Company as Chairman of the SIP Committee.  Wijnberg was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

46.     While the other individual members of the Plans Committee are currently unknown to Plaintiff, once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

47.     The Company maintains other committees that are fiduciaries to the Plans, names and individual members, are unknown to Plaintiff at this time; however once their identities are ascertained, Plaintiff will seek leave to join them under their names.

Individual Defendants

48.     Defendant Sandra Wright ("Wright") signed Marsh's Form 5500 Marsh Plan Annual Report for the fiscal year ended June 30, 2002, filed with the United States Department of Labor ("DOL"), on behalf of Marsh as the "Plan Administrator."  Wright was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

49.     Defendant William L. Rosoff ("Rosoff") signed Marsh's Form 5500 Marsh Plan Annual Report for the fiscal year ended June 30, 2001, filed with the DOL, on behalf of Marsh as the "Plan Administrator" of the Plans.  Defendant Rosoff was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plans' assets.

Trustees

50.     State Street Corporation was the SIP's trustee, effective April 1, 2003. The trustee is responsible for maintaining the assets of the SIP, making distribution payments as directed by the Company, and generally performing all other acts deemed necessary or proper to fulfill its responsibility as set forth in the trust agreement pertaining to the SIP.

51.     Deutsche Bank was the SIP's trustee prior to April 1, 2003, and as such was responsible for maintaining the assets of the SIP, making distribution payments as directed by the Company, and generally performing all other acts deemed necessary or proper to fulfill its responsibility as set forth in the trust agreement pertaining to the SIP.

52.     While the other trustees of the Plans Committee are currently unknown to Plaintiff, once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

Unknown Fiduciaries ("John Does 1-50")

53.     There are fiduciaries of the Plans whose identities are currently unknown to Plaintiff, including members of the various fiduciary committees.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

54.     Defendants include named and de facto fiduciaries with respect to the Plans.  All defendants exercised discretionary authority or control regarding management of the Plans, management of the Plans' assets, and/or administration of the Plans.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a Class Action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who were Participants of the Plans on October 14, 2004, and whose accounts held Company stock at that time (the "Class").  Excluded from the Class are Defendants or any member of their immediate families.

56.     The Class consists of over one thousand persons located throughout the United States.  Thus, the members of the Class are so numerous that joinder of all Class members in impracticable.  The exact number of Class members is not presently known to plaintiff, but can readily be determined by appropriate discovery.

57.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and ERISA litigation.  Plaintiff has no interests that are adverse or antagonistic to those of the Class.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to individually seek redress for the wrongful conduct alleged herein.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting solely individual members of the Class. Plaintiff envisions no difficulty in the management of this litigation as a Class Action.  Among the questions of law and fact common to the Class are:

(a)     Whether ERISA was violated by defendants' acts and omissions, as alleged herein;

(b)     Whether defendants breached fiduciary duties owed to plaintiff and the members of the Class by failing to act prudently and solely in the interest of the Participants; and

(c)     Whether and to what extent plaintiff and the members of the Class have sustained injury by reason of defendant's actions and omissions.

## **FACTUAL ALLEGATIONS**

### **A.     Background on the insurance industry**

60.     There are basically three types of entities in the insurance market.  First, there are clients – which are the companies or individuals that are interested in purchasing insurance, whether commercial or personal.  Second, there are brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage on the best terms.  Brokers represent the insurance purchaser, obtain price quotes, present the quotes to the client, and make recommendations to the

client that include factors other than price, such as differences in coverage, an insurance company's financial security, or an insurance company's reputation for service or claims payment.  Third, there are insurance companies.  They submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

61.     In this structure, the client makes two types of payments: (1) it pays its broker an advisory fee or a commission for locating the best insurer and arranging for the particular type of insurance coverage to be underwritten, and (2) it pays the chosen insurance company premiums for the coverage itself.  Typically, the broker's commission is not broken out from the total premiums due under the insurance policy.  Rather, the client typically writes one check for the entire premium and the insurance company pays the commission due under the policy to the broker.  Sometimes, particularly in the case of large clients, a fixed fee is paid by the client directly to the broker.

62.     In addition to the first commission payment described above, some of the very large commercial insurance brokers have made arrangements to receive a second, contingent commission, payment from insurance carriers out of the premiums paid by their clients.  These payments are usually made pursuant to contracts known as contingent commission agreements.  The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (1) how much business the broker's clients place with the insurance company; (2) how many of the broker's clients renew policies with the insurance company; and (3) the profitability of the business placed by the broker.

63.     Marsh's insurance brokerage business alone has approximately 42,000 employees in 410 offices located in over 100 countries.  Marsh cites its size and sophistication as

a primary reason to hire the company. Marsh holds itself out as a trusted advisor that can help its clients assess their insurance needs and locate the best available insurance. At least in performing this function, Marsh acts as an agent and fiduciary for its clients.

64.    To the contrary, however, a central part of Marsh's business plan is to promote the interests of insurance companies with whom they have contingent commission agreements. When Marsh steers business to the favored insurance companies, those insurance companies, in turn, pay Marsh higher fees. When Marsh helps favored insurance companies retain their existing business at renewal time, those insurance companies pay Marsh higher fees. When Marsh steers more profitable business (policies with low claims ratios) to favored insurance companies, those insurance companies pay Marsh higher fees. And when the clients pay higher premiums, volume and profitability rise -- again increasing Marsh's fees.

65.    In many instances, Marsh repeatedly provided clients with false and inflated quotes. It frequently designated a winner, and then solicited inflated bids from other insurance companies, who provided such bids, knowing that later they themselves would have a turn to get business without meaningful competition. Choices made by clients under these circumstances were made under false pretenses created by both Marsh and the cooperating insurance companies.

66.    Apparently aware of the patent conflict of interest posed by their broker (their agent) taking payments from the insurance companies seeking to sell a service to its client, Marsh asserts that it has erected an information barrier to prevent contingent commission agreements from influencing its recommendations: "Our Client Executives and advisory staff is [sic] unaware of our specific [contingent commission agreements], thereby further removing their ability to have these arrangements influence their recommendations."

67.     As set forth below, the information barrier that Marsh describes simply does not exist and this fact was well-known to defendants, as well as Marsh's practice of steering business to contingent commission-paying insurance companies and the importance of this arrangement to Marsh's business plan.

**B.      Marsh's business plan has been to increase its contingent commission income by steering clients to favored insurance companies.**

68.     According to Marsh's public filings, in 2003 it had profits of over $1.5 billion.  Marsh did not disclose how much of that amount was generated through fees paid by clients and how much was generated by insurance company contingent commission payments.  A Marsh official has stated that, in 2003, contingent fees paid by insurance companies amounted to approximately $845 million.  These payments, for which there is little or no overhead, are extremely profitable.

69.     The enormous size of these profits is not happenstance, but the result of careful planning.  Marsh reconfigured its brokerage business, centralizing power in a group based in Manhattan.  Marsh created lists of those insurance companies whose products its employees were to sell more vigorously to clients, lists based not on price or service, but on the amount of money the insurance companies would pay Marsh.  It rewarded those employees who sold clients more insurance from these complicit insurance companies, and it chastised those who did not.

70.     By way of brief background, during the 1980s and 1990s, the insurance brokerage industry underwent a period of consolidation.  Through acquisition and internal growth, Marsh became one of the world's dominant insurance brokers.  Until the late 1990s,

each of Marsh's numerous branch offices throughout the United States signed its own separate contingent commission agreements with insurance carriers.

71.     Beginning in the late 1990s, Marsh centralized its organization and assumed greater control over both business placement and contingent commission agreements. Marsh created an office in Manhattan that came to be called Marsh Global Broking, which oversaw policy placement decisions in Marsh's major business lines.  These included Excess Casualty, Healthcare, FinPro (Financial Products) and Middle Market (businesses paying less than one million dollars in annual insurance premiums).  Global Broking (also known as MMGB and MGB) was given authority over all of Marsh's contingent commission agreements and began to replace smaller local and regional contingent agreements with large national ones, called Placement Service Agreements.

72.     In addition, Marsh began internally rating the insurance companies based on how much they paid Marsh pursuant to their contingent commission agreements.  According to the Spitzer complaint, in February 2002, a Marsh Global Broking managing director in the Healthcare group provided nine of his colleagues with a list of the insurance companies that were paying Marsh pursuant to contingent commission agreements.

73.     A "tiering report" was later circulated to Global Broking executives, listing insurance companies as belonging to tiers depending on how advantageous their contingent commission agreement was to Marsh.  The instructions to the managers who received the list included a direction that they were to "monitor premium placements" to assure that Marsh obtained "maximum concentration with Tier A & B" insurance companies, those with contingent commission agreements most favorable to Marsh.  In a September 2003 email, a

Global Broking executive was even more direct: "We need to place our business in 2004 with those that have superior financials, broad coverage and <u>pay us the most</u>." (emphasis added)

74.     Marsh executives have issued directions about specific companies as well. According to the Spitzer complaint, in April 2001, a Global Broking managing director in the Excess Casualty group in New York wrote to the heads of regional centers.  She asked for "twenty accounts that you can move from an incumbent [insurance company]" to a company that had just extended its contingent commission agreement.  She warned, however, "You must make sure that you are not moving business from key [contingent commission companies]." Highlighting the incentive represented by her directive, she concluded, "[t]his could mean a fantastic increase in our revenue."

75.     The benefit of the steering system to the paying insurance companies was clear.  In July 2000, an executive in Marsh Global Broking is alleged in the Spitzer complaint to have written to four of her colleagues to discuss "BUSINESS DEVELOPMENT STRATEGIES" with a particular "preferred" insurance company that had signed a contingent commission agreement with Marsh.  In describing what Marsh had done for that company, she wrote, "They have gotten the 'lions [sic] share' of our Environmental business PLUS they get an unfair 'competitive advantage['] as our prefferred [sic] [insurance company]."

76.     Marsh has recognized and rewarded employees who "moved" clients to insurance companies with contingent commission agreements.  For example, the Spitzer complaint allege that in February 2003, a Marsh senior vice president in the Global Broking Healthcare group nominated a subordinate to become a vice president.  On the nomination form, under the heading "Financial Success," he noted that the nominee had increased Marsh's revenue "by moving" a renewing client to an insurance company with a contingent commission

agreement.  He concluded: "Neighborhood Health Partnership Estimated Revenue - $390,000."

That nominee's 2002 performance review, similarly noted that the nominee "was responsible for

the renewal of a large HMO in Miami and was successful with placing of this account with a

[contingent commission insurance company] - increased revenue from $120,000 to $360,000

(estimated)."  A 2003 self appraisal form by that same nominee -- now a vice president -- stated:

"Renewed large account with [contingent commission insurance company] to demonstrate our

willingness to continue our relationship.  Moved a number of accounts to [contingent

commission agreement carriers] for the sole reason to demonstrate partnership."  Other

employees were similarly praised in performance evaluations for increasing Marsh's contingent

commission income from insurance companies "by achieving budgeted tiering goals."

    77. In the same vein, Marsh employees have been criticized for bucking the

system.  Initially, when Marsh began signing national contingent commission agreements,

Global Broking not only negotiated all of the agreements but also kept all of the revenue.  Many

of Marsh's local and regional offices, which had previously had their own contingent

commission agreements with insurance carriers, resented the loss of revenue to the central

Global Broking office and refused to have Global Broking pass on all of their placements.

    78. Marsh's reward to employees for steering -- and its admonitions to

employees who failed to steer -- put the lie to Marsh's statement that a barrier prevents Global

Broking from influencing placement decisions.

    79. Marsh's steering harms its clients in at least two ways.  First, Marsh

specializes in complex insurance placements where all things are rarely equal, and where

subjective judgment calls have to be made among competitors with varying coverages, financial

security and price.  A client relies on Marsh to make these calls strictly based on the client's best

interest, without the corrupting influence of incentive payments.  Clients who have been steered have not received the service they paid for.

### C.    Marsh orchestrated a  "bid rigging" scheme

80.    In order to maintain its stranglehold on the brokerage business and ensure the success of its Placement Service Agreements, Marsh orchestrated a bid-rigging scheme with insurance companies.  The defendants have approved Marsh's participation in this scheme, in violation of antitrust and other laws.  At times, the insurance companies have gone much further, colluding with Marsh to rig bids and submit false quotes to unwitting clients throughout New York and across the United States.

81.    American International Group ("AIG") is a publicly traded company with approximately 86,000 employees and over $81 billion in annual revenues.  Among its insurance lines is excess insurance which covers losses over and above the amounts covered by the insured's primary insurance policies.  Beginning in or around 2001 until at least the summer of 2004, the defendants permitted Marsh Global Broking's Excess Casualty Group and AIG's American Home Excess Casualty division (AIG's principal provider of commercial umbrella or excess liability and excess worker's compensations insurance) to engage in systematic bid manipulation.

82.    When AIG was the incumbent carrier and a policy was up for renewal, Marsh solicited what was called an "A Quote" from AIG, whereby Marsh provided AIG with a target premium and the policy terms for the quote.  If AIG agreed to quote the target provided by Marsh, AIG kept the business, regardless of whether it could have quoted more favorable terms or premium.

83.     In situations where another carrier was the incumbent, Marsh asked AIG for what was variously referred to as a "backup quote," "protective quote" or "B Quote," telling AIG that it would not get the business.  In many instances, Marsh provided AIG with a target premium and the policy terms for these quotes.  In these cases, it was understood that the target premium set by Marsh was higher than the quote provided by the incumbent, and that AIG should not bid below the Marsh-supplied target.  For example, in October 2003, an underwriter at AIG described a particular quote that he had provided thusly: "This was not a real opportunity. Incumbent Zurich did what they needed to do at renewal.  We were just there in case they defaulted.  Broker . . . said Zurich came in around $750K & wanted us to quote around $900K." [Undated AIG email] Even when AIG could have quoted a premium lower than the target, it rarely did so.  Instead, AIG provided a quote consistent with the target premium set by Marsh, thereby throwing the bid.

84.     In other instances, Marsh asked AIG to provide B Quotes where AIG was not supposed to get the business, but Marsh did not set a particular premium target.  In these instances, AIG looked at the expiring policy terms and premium and provided a quote high enough to ensure that (1) the quote would not be a winner, and (2) in the rare case where AIG did get the business, it would make a comfortable profit.

85.     In B Quote situations, AIG did not do a complete underwriting analysis. In those few situations when AIG inadvertently won B Quote business (because the incumbent was not able or willing to meet Marsh's target), AIG personnel would "back fill" the underwriting work on the file -- that is, prepare the necessary analysis after the fact.

86.     Finally, Marsh came to AIG for a "C Quote" when there was no incumbent carrier to protect.  Although Marsh often provided premium targets in these situations, it was understood that there was the possibility of real competition.

87.     The "A, B, C" quote system was strictly enforced by Marsh through William Gilman, Executive Director of Marketing at Marsh Global Broking and a Managing Director.  Gilman refused to allow AIG to put in competitive quotes in B Quote situations, and, on more than one occasion, warned that AIG would lose its entire book of business with Marsh if it did not provide B Quotes.  Gilman likewise advised AIG of the benefits of the system.  As he put it: Marsh "protected AIG's ass" when it was the incumbent carrier, and it expected AIG to help Marsh "protect" other incumbents by providing B Quotes.

88.     ACE Ltd. is a Bermuda corporation that trades on the New York Stock Exchange.  ACE USA ("ACE") is part of a group of subsidiaries that forms the ACE Insurance North America business division of ACE Ltd.  In 2002, ACE decided to enter the excess casualty market by creating a separate division, called the Casualty Risk Department.  ACE signed a contingent commission agreement in order to gain access to the business Marsh controlled.  ACE also repeatedly provided the same type of B Quotes that AIG provided.

89.     The B Quotes given to Marsh were often in amounts requested by Marsh, even though a lower quote would have been justified by an underwriting analysis.  As ACE's President of Casualty Risk summarized:

> Marsh is consistently asking us to provide what they refer to as "B" quotes for a risk.  They openly acknowledge we will not bind these "B" quotes in the layers we are be [sic] asked to quote but that they 'will work us into the program' at another attachment point.  So for example if we are asked for a "B" quote for a lead umbrella then they provide us with pricing targets for that "B" quote.  It has been inferred that the 'pricing targets' provided are designed to ensure underwriters 'do not do anything stupid' as respects pricing.  [ACEINA-01909]

In this same email, the Casualty Risk president wrote that he "support[ed]" Marsh's business model, which he described as "unique."

90.     The bidding process for excess casualty insurance for Brambles, USA, a manufacturer of commercial industrial pallets and containers (among other products), demonstrates the bid-rigging scheme.  In June of 2003, ACE learned that Brambles was unhappy with the incumbent carrier.  Despite this, Marsh asked ACE to refrain from submitting a competitive bid because Marsh wanted the incumbent, AIG, to keep the business.  An ACE Vice President of underwriting wrote to the ACE President of Risk and Casualty:

> Our rating has a risk at $890,000 and I advised MMGB NY that we could get to $850,000 if needed.  Doherty gave me a song & dance that game plan is for AIG at $850,000 and to not commit our ability in writing.

91.     ACE continued to provide Marsh inflated quotes into 2004.

92.     Marsh did not limit its bid rigging practices to its large corporate clients. It also engaged in such conduct with The Hartford Financial Services Group ("Hartford") – a provider of life group benefits, auto, home ownership and business insurance -- with respect to Marsh's "Middle Market" and small business clients.

93.     Middle Market insurance provides coverage for companies where the annual premium ranges from tens of thousands of dollars to around $1 million.  Hartford became a "partner market" -- meaning it agreed to pay contingent commissions -- with Marsh's so-called Advantage America program in July 2003.  The Advantage America program was developed by Marsh to fold its small commercial property/casualty business into its Middle Market group. With annual premiums in the range of $25,000 to $200,000 dollars, this program provided coverage to small businesses.  Marsh centralized all of this small business insurance placement in an office in Lake Mary, Florida, near Tampa.

94.     Hartford was given the advantage of office space in Marsh's Lake Mary facilities.  On numerous occasions during 2003 and 2004, Marsh employees asked the two Hartford underwriters assigned to this facility, either in person or by telephone, to provide an inflated quote or "indication" (non-binding proposed price) for insurance coverage for a small business.  Typically, Hartford's underwriters were told to price the quote or indication 25% above a particular number, and that by doing so Hartford need not worry that it would get the business.  Hartford colluded in the scheme.

95.     Marsh did not restrict its bid rigging in the Middle Market to small businesses.  Marsh's Los Angeles area Global Broking office handled larger Middle Market risks with annual premiums reaching $1 million.  The Marsh Los Angeles office is in the same office building as Hartford's.  Starting as far back as 2000, Marsh employees, on virtually a daily basis, asked Hartford for inflated quotes or indications in a manner similar to the process described above for the Florida facility.  In Los Angeles, however, Marsh often provided Hartford with a spreadsheet showing the accounts for which it wanted Hartford to provide a losing quote or indication, along with other insurers' quotes.  It instructed Hartford to quote some percentage, typically 25%, above the other insurers' quotes on the spreadsheet to ensure that Hartford would not get the business.  These were referred to as "Throwaway Quotes."  Hartford provided the inflated quotes.

96.     On even larger risks in Southern California, those of over $1 million of annual premium, Marsh similarly asked for inflated quotes or indications, also providing spreadsheets containing other insurers' quotes to Hartford.  Hartford provided these quotes as well.  Hartford provided these quotes and indications because Marsh was its biggest broker, and it felt that Marsh would limit its business opportunities if it refused.

97.     As of 2001, Munich-American Risk Partners, ("Munich") another insurance company, had entered into separate contingent commission agreements with Marsh's Excess Casualty, Property, FINPRO (Financial Products) and Health Spectrum Groups.  Munich adjusted its rates to pass the costs of these agreements on to its clients.  When pricing Marsh business, Munich determined the base premium for the policy, added a percentage to reflect the expected contingent commission and sent the quote to Marsh.

98.     In 2000, Munich disclosed the existence of its contingent commission agreement with Marsh to a significant client to explain the contingent commissions that were being passed on to the client.  Marsh was furious, and chastised Munich.  A senior vice-president at Munich, apologized to Marsh in an email: "We acknowledge that this was inappropriate behavior . . . ."  He told Marsh that Munich would: "do the necessary to eliminate all documentation, electronic or otherwise, that references or otherwise alludes to the [contingent commissions].  I apologize for the consternation that this has caused within the Marsh organization."

99.     Throughout 2001 and early 2002, the Marsh Global Broking Excess Casualty Group repeatedly requested that Munich provide "favors" designed to assist Marsh in its bid rigging process.  The panoply of market-manipulative "favors" that Marsh requested from Munich included:

- Requests to submit "false quotes" to allow Marsh to manipulate market pricing and present other carriers' quotes in a more favorable light;

- A request on a particular account that Munich either decline the risk altogether or submit a quote higher than the incumbent quote [December 18, 2001 email from a Marsh senior vice president to a Munich regional manager];

- Requests that Munich not bid on a renewal because Marsh owed the incumbent a favor and didn't want Munich to come in with a lower quote and

A request for an artificially inflated initial quote so that Marsh could look good to the client when it "negotiated" the quote down.

100.    Throughout 2001, Marsh also asked Munich to act as "back-up or wait in the wings" at several client presentations.  That is, Marsh asked Munich to attend presentations for prospective clients with whom Munich was already out of the running.  One Munich regional manager characterized these presentations as mere "Drive bys."  For example, in 2001 Marsh sent Munich an email request explaining that it "needed to introduce competition" at a prospective client presentation and needed Munich to send a "live body."  Frustrated with Marsh's continuous requests for "live bodies," one Munich regional manager responded, "WE DON'T HAVE THE STAFF TO ATTEND MEETINGS JUST FOR THE SAKE OF BEING A 'BODY.'  WHILE YOU MAY NEED 'A LIVE BODY,' WE NEED A 'LIVE OPPORTUNITY.'"

101.    In preparing for an April 2001 meeting with Marsh, a senior vice-president solicited reactions from his regional managers regarding their experiences with Marsh Global Broking.  He then cut and pasted the managers' comments into a single document and circulated it to them for discussion.  Complaints and reactions from the Munich regional managers included:

> I am not some Goody Two Shoes who believes that truth is absolute but I do feel I have a pretty strict ethical code about being truthful and honest with people.  And when I told [sic] I have to say certain things I know to be untrue to people I respect and have known for a long time, it is not what I feel I should be asked to do of [sic] what this company stands for.  Yet it has already happened several times and I have either had to dodge the client and broker on the issue, which won't always work, or risk making GB [Global Broking] angry by telling a carefully edited version of the truth, which was more than they wanted out but less than satisfying to the client or broker.

> This idea of "throwing the quote" by quoting artificially high numbers in some predetermined arrangement for us to lose is repugnant to me, not so much because

I hate to lose, but because it is basically dishonest.  And I basically agree with the comments of others that it comes awfully close to collusion or price fixing.

WHAT ARE THE RULES ON PRICING - ARE WE TO QUOTE OUR NUMBERS OR WHAT MGB [MARSH GLOBAL BROKING] WANTS US TO QUOTE - HOW DOES THEIR INTERNAL PREFERRED MARKET THING WORK?

**D.     The Greenville County School Project**

102.    Marsh's involvement with the Greenville, South Carolina Public School District illustrates how Marsh both abused its fiduciary role in an attempt to secure a contingent commission agreement with an insurance company and rigged the bidding process.

103.    In the 1990's, Greenville County, South Carolina experienced unanticipated student growth beyond the capacity of then existing facilities for the 62,000 school children in the district.  In addition, many of the existing schools needed extensive renovations. The school district, through a non-profit corporation named BEST (Building Equity Sooner for Tomorrow), raised $800 million by selling bonds to fund the renovation, expansion, and new construction of fifty-five school facilities (the "Greenville project").  BEST hired Institutional Resources, LLC, as the program manager and procurement agent for the project.  As part of its responsibilities, Institutional Resources had to procure insurance coverage for the project.

104.    Lacking expertise in insurance, Institutional Resources hired Marsh after conducting a search and evaluating broker proposals.  In Marsh's application materials provided to Institutional Resources, it pledged its loyalty to its clients, going so far as to include a section devoted to Marsh's role as a "trusted business advisor."  For its role in the Greenville project, Marsh was to be paid approximately $1.5 million.

105.    During the bidding process, there were two serious bidders who competed for the business: Zurich North America ("Zurich") and ACE.  Unbeknownst to Greenville, however, while this bidding process was ongoing Marsh held out the Greenville project as a

"carrot" in its effort to entice Zurich to sign a contingent commission agreement.  In a December

12, 2002 email, Joan Schneider, a Marsh Global Broking executive, explained to Zurich:

> [Y]ou are currently in the running on Greenville Country [sic] School System
> (FIX cost near 3MM) .... neck and neck with ACE who we have a PSA with .......
> Will bind most likely after the first of the year ...... where are we on the
> [contingent commission] agreement ..... Left messages but haven't heard from
> you ...... hint hint.

106.    Between the December 12, 2002 email and the award of the contract on

January 3, 2003, the contingent commission negotiations progressed and the project was awarded

to Zurich.  Although Zurich and Marsh never entered a contingent commission agreement,

Marsh made clear its view of the linkage:

> [p]er our conversation today, (sorry to call you during your vacation) the good
> news is that we are binding Greenville County School with you today!!!!!!  We
> worked hard to get this to you and as we discussed expect it to be part of the
> [contingent commission] agreement.  On your return Monday, I hope you and
> your regional folks can get this ironed out .......  this is a great start to the New
> Year and would like to keep it going.

107.    As part of its vigorous effort to steer the Greenville contract to Zurich,

Marsh sought a false bid from a competing insurer and then, despite that insurer's refusal,

submitted a wholly fictitious bid on that insurer's behalf.  On December 16, 2002, Glenn R.

Bosshardt, the Global Broking vice-president assigned to the project and Joan Schneider's

subordinate, contacted an assistant vice-president of underwriting at CNA, an individual with

whom he had previously worked and who had already told Bosshardt that CNA had no interest in

bidding on the Greenville project.  In an email Bosshardt stated:

> [P]er my voicemail, we need to show a CNA proposal.  I will outline below the
> leading programs (ACE & Zurich).  I want to present a CNA program that is
> reasonably competitive, but will not be a winner.  (emphasis added)

Bosshardt proceeded to reveal the ACE and Zurich quotes on the project and then proposed

numbers that CNA should quote in order to lose the bid but still appear to have been competitive.

Although CNA never authorized Marsh to submit this bid, it was submitted to Institutional Resources as a legitimate competing bid.

108.     Notably, Marsh -- at a time when the prospect for a contingent commission agreement with Zurich remained real -- advised Institutional Resources that Zurich was a superior company and should be awarded the bid.  Marsh did not disclose to Institutional Resources either that it was seeking a contingent commission agreement from Zurich, or that it had falsely submitted a bid under CNA's name.  Institutional Resources followed Marsh's recommendation and awarded the project to Zurich.

109.     Even though Zurich and Marsh never entered into the contingent commission agreement, in his 2003 performance review, Bosshardt was praised for having "assist[ed] in the implementation of MMGB's excess liability strategy to maximize contingent commission revenue."

## DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

110.     The above allegations are examples of business practices in which Marsh was engaged which were fraudulent, illegal, improper and opened the Company up to loss of revenue, loss of business, tarnished reputation, civil and criminal liability, potential downfall, lost access to credit, and other harmful results.  The breached their fiduciary duties to the Plans and its Participants because they failed to (i) monitor the Company's administrators and to provide them with accurate information; (ii) provide complete and accurate information to the Participants; and (iii) avoid conflicts of interest.

111.     On October 14, 2004, the New York Attorney General brought a suit against the Company on the instant allegations.

112.     On October 15, 2004, Marsh announced it was "suspending" its practice of using Placement Service Agreements.  The agreements reportedly accounted for $845 million of Marsh's $1.5 billion in earnings in 2003.

113.     On October 19, 2004, state governments of Pennsylvania and Connecticut announced they too were opening investigations into the matters alleged in the Spitzer complaint.

114.     Also on or about October 19, 2004, the Company announced SIP Participants would be able to diversify their investments, finally pulling them out of Marsh stock if they choose, starting October 25, 2004.

115.     On October 20, 2004, Marsh announced that the release of the Spitzer complaint may prevent Marsh from borrowing under its $2.755 billion revolving credit facilities.

116.     In one week's time after the Spitzer Complaint was made public, the Company's stock lost almost 50% of its value, falling from $46.13 on October 13, 2004, to approximately $24.85 on October 21, 2004.  The stock is currently priced at $32.02, still well below its value at the time of the filing of the Spitzer lawsuit.

117.     ERISA section 404(a)(1)(A) imposes on a Plan fiduciary a duty of loyalty – that is, a duty to "discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries...."  Section 404(a)(1)(B) also imposes on a Plan fiduciary a duty of prudence – that is, a duty to "discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims...."

118.    A Plan fiduciary's duties of loyalty and prudence include a duty to disclose and inform.  This duty entails:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of Participants. This duty to disclose and inform recognizes the disparity that may exist, and in this case did exist, between the knowledge of the fiduciaries, on the one hand, and the Participants, on the other.  In a Plan with various funds available for investment, this duty to inform and disclose also includes:  (1) the duty to impart to Plan Participants material information of which the fiduciary has or should have knowledge that is sufficient to apprise the average Plan Participant of the risks associated with investing in any particular fund; and (2) the duty not to make material misrepresentations.

119.    Defendants breached their fiduciary duties to disclose and inform with respect to the Plans' investment in Company stock.  The massive investments in Company stock in the Plans was an undiversified investment in a single company's stock whose public price was based on expectations of proper business practices.  As a result, any such investment carried with it an inherently high degree of risk.  These inherent risks made the defendants' duty to provide complete and accurate information to Participants concerning the Company stock is even more important than it would be otherwise.  Rather than providing complete and accurate information to the Plans' Participants regarding the risks of investing in the Company stock in the Plans, defendants withheld and concealed material information during the relevant period and before as set forth above, and instead actively misled the Participants of the Plans about the Company's prospects and business practices, thereby encouraging Participants of the Plans to continue to make and to maintain substantial investments in Company stock in the Plans.

120.    A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plans, including Company securities, to ensure that each investment is a suitable option for the Plans.  During the relevant period, none of the defendants could have reasonably made a determination that Marsh stock was a suitable investment for the Plans.

121.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a Plan with an "eye single" to the interests of the Participants, regardless of the interests of the fiduciaries themselves or the Plans' sponsor.

122.    Defendants breached their duty to avoid conflicts of interests and to promptly resolve them when they occur by continuing to maintain Participants' investments in large amounts of Company stock and by failing to permit diversification thereof.

123.    Defendants also breached their fiduciary duties under ERISA by failing to lift the bar precluding members of the Plans from selling their Marsh shares when Marsh was announcing shockingly bad news about its business practices, which defendants were aware would cause Marsh's share price to plummet.  For example, defendants knew in April 2004 that Eliot Spitzer was investigating the practices alleged herein, yet they did not provide the opportunity for Participants to diversify their investments outside of Marsh stock.

124.    Plaintiff further contends that the Plans suffered a loss, and plaintiff and the other class members were damaged, by defendants' above-described conduct that fundamentally deceived plaintiff and the other class members about the prudence of making and maintaining investments in Marsh stock, and that, in making and maintaining investments in

Marsh stock, plaintiff and the other Class members relied to their detriment upon defendants'

materially deceptive statements, acts and omissions.

**COUNT I**
**FAILURE TO DIVERSIFY**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404)**

**(Against All Defendants)**

125.    Plaintiff incorporates the allegations contained in the previous paragraphs

of this Complaint as if set forth fully herein.

126.    As fiduciaries, pursuant to 29 U.S.C. § 1104(a), each defendant was

required to:

> [D]ischarge his duties with respect to a Plan solely in the interest
> of the participants and beneficiaries and ---
>
> (A)  for the exclusive purpose of
>
>      (i)      providing benefits to participants and their
> beneficiaries; . . . .
>
> (B)      with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a like
> capacity and familiar with such matters would use in the conduct
> of an enterprise of like character and with like aims; . . . .

127.    Each of the defendants was also a co-fiduciary of the other defendants,

pursuant to 29 U.S.C. § 1105.  Under that section, each fiduciary is liable for the acts of another

fiduciary:

> (1) if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary, knowing such
> act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1) [29 USC §
> 1104(a)(1)] in the administration of his specific responsibilities

which give rise to his status as a fiduciary, he has enabled such
other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless
he makes reasonable efforts under the circumstances to remedy the
breach.

128.     All defendants breached the fiduciary duties they owed Plaintiffs, the
Class and the Plans by failing to lift the bar precluding members of the Plans from selling their
Marsh shares prior to the time they have now stated Participants can diversify – October 25,
2004.

129.     As a result of the trading bar, Class Members were unable to sell their
Marsh stock during the crucial period of time in which the stock dropped precipitously during
the relevant period.

130.     In light of the extraordinary circumstances in which the defendants knew
or should have known that Marsh (and its over-valued stock) were on the brink of collapse, the
defendants had a fiduciary duty to lift the bar to allow Plan Participants to sell off their Marsh
stock.

131.     Moreover, the defendants offered few alternatives to Marsh stock, as most
of the other Plans' investment options were in Putnam funds, which are managed by the
Company and have undergone recent scandals concerning their permitting some traders to
benefit at the expense of all other fund investors.

132.     Each defendant knowingly participated in these fiduciary breaches of its
co-fiduciaries, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to
comply with the provisions of 29 U.S.C. § 1104(a), and had knowledge of the breaches of its co-
fiduciaries and failed to make reasonable efforts to remedy such breaches.

133.    The above-described breaches of fiduciary duty give rise to the presumption that, but for the breaches of fiduciary duty, the Participants in the Plans would not have maintained their investments in Marsh and would have instead moved their Plan assets to the most profitable alternative investment available.  This remedy will restore the values of the Plans' assets to what they would have been if the Plans had been properly administered.

134.    As a direct and proximate result of enforcing the trading bar in violation of ERISA as described above, the Plaintiffs, the Plans and the Class lost millions of dollars.

135.    Pursuant to 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), defendants are liable to restore the losses to the Plans that occurred in violation of the defendants' fiduciary duties.

## COUNT II

### Failure to Prudently and Loyally Manage Plan Assets
### (Breaches of Fiduciary Duties in Violation of ERISA § 404)

### (Against All Defendants)

136.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

137.    At all relevant times, as alleged above, the defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

138.    As alleged above the defendants were all responsible, in different ways and to differing extents, for the selection, maintenance and monitoring of the Plans' investment options, including the option of Company stock.

139.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to Participants under a plan are prudent.  Furthermore, such

fiduciaries are responsible for ensuring that assets within the Plans are prudently invested. The defendants were responsible for ensuring that all investments in the Plans were prudent, and are liable for losses incurred as a result of such investments being imprudent.

140.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan Participants. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan Participants, nor allow others, including those whom they direct or who are directed by the plan to do so.

141.    The defendants breached their duties to prudently and loyally manage the Plans' assets. Defendants knew or should have known that Marsh stock was not a suitable and appropriate investment for the Plans as described herein for either (1) Marsh stock purchased through Participant contributions to the Plans, (2) Marsh stock accumulated by the Plans through Company matching contributions, or (3) requiring Participants to maintain a certain level of Marsh stock in their accounts. Nonetheless, during the relevant period, these fiduciaries continued to offer the Marsh stock as an investment option for the Plans and to direct and approve Plan investment in Marsh stock, instead of in cash or other investments. Moreover, during the relevant period, despite their knowledge of the imprudence of the investment, Defendant failed to take adequate steps to prevent the Plans, and indirectly the Plans' Participants, from suffering losses as a result of the Plans' investment in Marsh stock.

142.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a

plan with single-minded devotion to the interests of the Participants, regardless of the interests of the fiduciaries themselves or the plans' sponsor.

143.    The defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, making no effort to remedy, and/or knowingly undertaking to conceal, their fellow defendants' failure to prudently and loyally manage the Plans' assets in the exercise of their discretion with respect to the requiring Company stock as an investment in the Plans despite knowing that such failures were breaches of their ERISA-mandated fiduciary duties.

144.    Defendants named in this Count were unjustly enriched by the fiduciary breaches described in this Count.

145.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other Participants, lost a significant portion of their, retirement investment.

146.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

**Failure to Monitor the Committees and to Provide Them With Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404)**

**(Against All Defendants)**

147.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

148.    At all relevant times, as alleged above, defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

149.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of the defendants included the responsibility to monitor other fiduciaries.

150.     The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries, including committees at Marsh in charge of administering the Plans.  In this case, that meant that the monitoring fiduciary, defendants, had the duty to:

(1)     Ensure that the monitored fiduciaries possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of Plan Participants;

(2)     Ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed;

(3)     Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(4)     Ensure that the monitored fiduciaries had adequate information and to do their job of overseeing the Plans investments;

(5)     Ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to Plan investment options; and

(6)     Ensure that the monitored fiduciaries reported regularly to the Company.  The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

151.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the

investment of plan assets, and must take prompt and effective action to protect the Plans and Participants when they are not. The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the Plans.

152. The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the Plans' performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the Plans' Participants or for deciding whether to retain or remove them.

153. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the Plans and the Plans' assets.

154. The defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business improprieties alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk inherent in the significant investment by rank and file employees in an undiversified employer stock fund. The defendants knew or should have known that the fiduciaries it was responsible for monitoring were imprudently allowing the Plans to continue offering and

requiring the Marsh stock as a Plan investment, and continuing to invest in Marsh stock when it no longer was prudent to do so, yet failed to take action to protect the Participants from the consequences of these fiduciaries' failures.

155.    In addition, as a result of its inappropriate practices and implicit knowledge thereof, the defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of Marsh that it knew or should have known that these defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, defendants breached their monitoring duties under the Plans and ERISA.

156.    The defendants are liable as a co-fiduciaries because: (1) they knowingly participated in the fiduciary breaches by their fellow defendant-fiduciaries in the activities implicated in this Count; (2) they enabled the breaches by these defendants; and (3) they had knowledge of these breaches yet failed to make any effort to remedy them.

157.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

158.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other Participants, lost a significant portion of their retirement investment.

159.    Pursuant to ERISA § 502(x), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

**COUNT IV**

**Failure to Provide Complete and Accurate Information
to Plan Participants
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA)**

**(Against All Defendants)**

160.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

161.    At all relevant times, as alleged above, defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

162.    At all relevant times, the scope of the fiduciary responsibility of the defendants included the Plans' communications and material disclosures.

163.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plans or Plans' assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plans.  This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plans' investment options, such that Participants can make informed decisions with regard to the prudence of investing in such options made available under the Plans.  This duty applies to all Plan investment options, including investment in Marsh stock.

164.    Because investment in the Plans was not diversified (i.e., the defendants chose to invest the Plans' assets, and/or allow those assets to be invested, so heavily in Marsh stock), such investment carried with it an inherently high degree of risk.  This inherent risk made the defendants' duty to provide complete and accurate information particularly important with respect to Marsh stock.

165.    The defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding Marsh stock, Marsh's business improprieties, public misrepresentations and the consequent artificial inflation of the value of Marsh stock and, generally, by conveying inaccurate information regarding the soundness of Marsh stock and the prudence of investing retirement contributions in Marsh equity.  These failures were particularly devastating to the Plans and the Participants; a heavy percentage of the Plans' assets were invested in Marsh stock and thus, losses in this investment had an enormous impact on the value of Participants' retirement assets.

166.    Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding Marsh stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to Participants, yet did not make any effort to remedy the breaches.

167.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan Participant that results in harm to the Participant, the Participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, the above-described statements, acts and omissions of the defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Marsh stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested the Plans' assets in Marsh stock during the relevant

43

period.  Plaintiff and the other Class members are therefore presumed to have relied to their

detriment on the misleading statements, acts, and omissions of the defendants as described

herein.

        168.     Defendants in this Count were unjustly enriched by the fiduciary breaches

described in this Count.

        169.     As a direct and proximate result of the breaches of fiduciary duties alleged

herein, the Plans, and indirectly Plaintiff and the Plans' other Participants, lost a significant

portion of their retirement investment.

        170.     Pursuant to ERISA § 502(a)(2),29 U.S.C. § 1132(x)(2) and ERISA § 409,

29 U.S.C. § 1109(a), defendants in this Count are liable to restore the losses to the Plans caused

by their breaches of fiduciary duties alleged in this Count.

### COUNT V
### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA)

### (Against All Defendants)

        171.     Plaintiff incorporates the allegations contained in the previous paragraphs

of this Complaint as if fully set forth herein.

        172.     At all relevant times, as alleged above, defendants were fiduciaries within

the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

        173.     ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan

fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely

in the interest of the Participants and for the exclusive purpose of providing benefits to

Participants.

174.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia, failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in the Marsh stock; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made Marsh stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices, and maintain a large portion of the Company's shares outstanding with the Plans' Participants; and by otherwise placing the interests of the Company and/or defendants above the interests of the Participants with respect to the Plans' investment in Company stock.

175.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' otherwise Participants, lost a significant portion of their retirement investment.

176.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    Declaration that the defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    An Order compelling the defendants to make good to the Plans all losses to the Plans resulting from defendants' breaches of their fiduciary duties, including losses to the Plans

resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits

the defendants made through use of the Plans' assets, and to restore to the Plans all profits which

the Participants would have made if the defendants had fulfilled their fiduciary obligations;

C.      Imposition of a Constructive Trust on any amounts by which any defendant was

unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.      An Order enjoining defendants, and each of them, from any further violations of

their ERISA fiduciary obligations;

E.      Actual damages in the amount of any losses the Plans suffered, to be allocated

among the Participants' individual accounts in proportion to the accounts' losses;

F.      An Order that defendants allocate the Plans' recoveries to the accounts of all

Participants who had any portion of their account balances invested in Company stock

maintained by the Plans in proportion to the accounts' losses attributable to the decline in the

price/value of Company stock;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

common fund doctrine; and

I.     An Order for equitable restitution and other appropriate equitable monetary relief

against the defendants.

Dated:  March 14, 2005

**GOODKIND LABATON RUDOFF**
**& SUCHAROW LLP**

Jonathan M. Plasse (JP 7515)
Christopher J. Keller (CK 2347)
Shelley Thompson (MT 4109)
100 Park Avenue
New York, New York 10017-5563
Tel: (212) 907-0700
Fax: (212) 818-0477

**GOLDMAN SCARLATO**
**& KARON, P.C.**
Mark S. Goldman
T. Brent Jordan
1845 Walnut Street
Suite 1100
Philadelphia, PA 19103
Tel: (215) 545-7200
Fax: (215) 545-6535

C:\Documents and Settings\bernarb\Local Settings\Temporary Internet Files\OLK13B\Pelletier Complaint.DOC
[3/9/2005 12:52 PM]

47